The first case is number 23-1867 National Association of Government Employees, Inc. v. Janet Louise Yellen, et al. At this time, would Counsel for the Appellant please introduce himself on the record to begin? Good morning. I'm Thomas Gagin on behalf of the Plaintiff Appellant for the National Association of Government Employees. May it please the Court. When the Plaintiff Union filed this case on May 8, 2023, the Secretary of Treasury had already defaulted several months before on the debt owed to thousands of our members who at that time had no legally enforceable guarantee to be reimbursed except on the possibility of an act of Congress to raise the debt ceiling sufficiently to repay them in an amount that would reimburse them for their losses. And in 12 weeks, the Secretary of Treasury will be in a position again on January 2, 2025 where she will have no choice but to default on the debt of our members again. That's two defaults in the course of a single case before this Court. And that is not the only harm that plaintiffs faced or that members faced on May 8, 2023. By the time that the plaintiff had motioned a request for a preliminary injunction, the government had told our members that there would be a delay of their paychecks, indefinite delay of their paychecks, because on June 5, 2023, the United States government would be out of cash. That was the so-called ex-date. All paychecks would be upheld. And as the Court knows, of course, from the briefing and from the facts, on June 3, two days before the ex-date, a law was signed into effect that did not raise the debt ceiling but simply postponed the ex-date to a later time. And what will happen on January 2, under that law called, ironically, the Fiscal Responsibility Act, what will happen under that law on January 2 is that the United States will then be in breach of the debt ceiling again. The debt ceiling will go back into effect. And under the existing law, the Secretary will have no further borrowing authority. And what does that mean? It means that on January 2, the Secretary is running the government only on cash on hand. Counsel, aren't you, and this is a point that the District Court makes, among other things, you're inescapably speculating about a failure of other branches of government to avoid a debt default that has never happened in the history of this country. It's hard to imagine a scenario that is more inherently speculative than what you're talking about. And that degree of speculation confronts you with a very serious standing issue, which is one of the points that the District Court makes. How do you avoid the speculative nature of what you're focusing on here and its implications for your standing? Your Honor, the existence of 8438 of Title V, which authorizes a default, and a default will occur, just as it occurred on May 8 and had occurred, in fact, in January. That's not a speculation. Excuse me. To the extent there are any consequences for your clients, they have been made whole. In fact, by law, they have to be made whole, do they not? They do not have to be made whole by law. They are not made whole unless Congress enacts another law that provides that they will be made whole. To answer your question, Judge, directly, we are not engaged in any speculation, and we urge this Court not to speculate. The function of an Article III court is to decide a case under the existing law. Under the existing law, under the existing law, there will be a date, January 2, where the Secretary will have no further bargaining authority. That is the law, unless and until Congress changes the law. And it is the function of an Article III court not to turn away an Article III case when there is standing, when the existing law mandates an injury, on the ground that the law may change. In fact, no law in this country could be challenged under the Constitution if the Justice Department could come in and tell the Court, well, you never know, it might change. And while it is true that there has not been a massive default on the debt, there has been two defaults on the debt that is owed to our members, one in 2011, one in 2023, and inevitably there is going to be one under the existing law in January. You are representing that your client suffered an injury which was not remedied as a result of the defaults that you described? It was remedied not under the existing law. It was remedied by the enactment of a different law, of a subsequent law. But there is no guarantee that that law will be enacted. We're not, it is the... So that history is simply irrelevant to an analysis of how speculative your argument is? Your Honor, there are a lot of things that have never happened and that we thought were never going to happen that have happened. And in the end, it is not the function of this Court to go back and say, well, this is what has happened in the past and it looks like Congress may do something like that again. That's a judgment that is appropriate to an op-ed page. That is not a judgment that is appropriate to a court of law. A court of law decides what the law is that is set before it and that is presumed to stay into effect until Congress changes it. Counsel, what's the difference between what you're arguing and what someone might argue any time that the budget process is still ongoing? Any time there isn't a next term budget or a continuing resolution, funds aren't available for whatever the project might be? There's a giant difference. And the difference, Your Honor, is that there is no duty on the part of the United States government to have a budget or to continue operating the government at all with any kind of cash. But under Section 4 of the 14th Amendment, the Public Debt Clause, the United States debt, the validity of the debt may not be questioned. And under Article 1, the power to borrow, the power to borrow is based on the United States pledging its full faith and credit behind that power. That is why for Congress. So you've established, for purposes of argument, a duty, but you haven't, in my view, you haven't established imminence in that respect for all the reasons that Judge LaPez has stated. But, Your Honor, in the course of this case, the government did default on the debt owed to our members. There was a default. This is not a case where we're talking about whether a default will occur. It occurred. There was subsequently a law that fixed it. But under the law that existed when we filed this suit on May 8th, a massive default on the debt owed to our members had been in effect for four months, went on for another five months, and it would have gone on indefinitely, but for the fact that on June 3rd, against the opinions of some people who thought that there was going to be a debt default, there was a last-minute reprieve, not to raise the ceiling, but to postpone it to January 2nd. And on that date, there were 117 members of the United States House and 37 senators who voted against that increase, who voted to trigger a default on that date and to have this go on indefinitely and permanently and become a broader financial panic. So to say— Counsel, let me ask you. January 2nd is still three months away. But the way I'm seeing it is, again, following everything Judge LeBest said, but Congress, there's an election coming up. But after that, the lame duck session, this might be resolved. But why should the court step in and not give Congress that opportunity? For two reasons. First of all, the court has no way of knowing whether it's going to be resolved, and that's not an appropriate judicial function. That is not—and I say this with due respect—that's not your job, Judge. Your job is to figure out what the law says and whether that law is consistent with the Constitution. And it is virtually certain, even if we were to make a prosecution, that there's going to be another debt default, there's going to be another period of time where the plaintiffs or the members of the plaintiff union are the punching bag. You may notice this is—it's true that there's never been a default so far, but this is like the Groundhog Day movie. You know, the secretary rolls out a default on the debt of the members who have gone into these G funds because they're the safest possible investment, they have to hold their breath, they have to wait for Congress to enact a law to save them. There is no basis for this court, and I don't know of any authority in which a court has turned away an Article III case, a valid Article III case, which is—and we're quite different from the Williams v. Luke case— on the ground that maybe Congress would change the law. Imagine, that would be a terrible precedent for this court to set, and it would be this court that would be setting it, because there's no question here that there was injury in fact at the time of the filing of this suit, and there's no question that there's meaningful relief still to be given. I thought the D.C. Circuit addressed this very issue and rejected the position that you're now advocating. It did not. Okay. And we distinguished that in our briefing, but let me briefly summarize it.  Mr. Williams was a private investor. You know, he could go in and out of the market at any particular time. The court said it was contingent whether he would be in the market, whether the secretary would default on his particular bond as opposed to somebody else's. And the main point that the court made is that Mr. Williams didn't have to worry, because under Title V, 8438, the secretary will default on our debt first. So the secretary first has to take an emergency measure of defaulting on the debt owed to the people who were in the G Fund. So in our case, we are in a government fund where we have no control over it. The secretary exclusively is in control of it. The secretary buys and sells the securities, and there is total control by the secretary, and we are in harm's way. We will be in the fund when the United States runs out of cash. And, in fact, there was a default. The basic difference between our case and Williams is that there was no default for Williams. They did default on us. It was an entirely different facts situation. But you still have to you're seeking declaratory relief. You still have to show that it's likely to happen again. It will happen under existing law. Yeah, I understand. But we're still waiting for an answer to what is the reason to think that the other branches won't resolve it in time, based on past history and the way our government operates? And even if they don't resolve it, what's the evidence that there isn't sufficient cash on hand? And if there isn't sufficient cash on hand, what's the evidence that they won't find another solution to it? That, to me, does not suggest anything beyond, as Judge Lopez said, a speculative conclusion that this will happen again. Your Honor, all I can say is that this Court is supposed to decide the existing law, and the existing law does not have an end date. It does not have a guarantee. No, you're incorrect about that, aren't you? I thought we had established that for declaratory relief, you have to show that it's likely to happen again. Am I wrong about that? You're correct. Under existing law, you're absolutely correct. And under existing law, it will happen again. The law has to change for this not to happen. Congress has to go through the fraught process of enacting legislation, which is a fraught process, to keep this from occurring. Under the law, it will happen. It's not speculative. It will happen. The question is whether or not this Court should step outside its role as an Article III Court and decide, well, we're now in the business of trying to figure out what Congress will do. And that is improper. And that is acting beyond your authority as a judge. You do not have the right as an Article III judge to go and make decisions based on what you think Congress might do. Your job is to decide the case under the existing law, and the existing law makes certain that there will be, A, the Secretary will run out of borrowing authority on January 2nd. She will have no choice but to default on the debt again. And there is no guarantee that these members of ours have to be reimbursed, but for the possibility that Congress or the Court may act. And because this Court cannot assume that Congress will change a law, because that's a heavy lift, this Court has a duty to decide the law. Counsel, Counsel, you're out of time. I'm sorry. It's all right. Thank you.  Thank you, Counsel. Let's hear that from Counsel for Secretary Yellen. Please do introduce yourself on the record to begin. Your Honor, may it please the Court, Urgent Mental for the Government. As you've just heard, to the extent plaintiff's claims are premised on allegations of hypothetical future harm, they are too speculative to support Article III standing. It's hard to imagine a scenario more inherently speculative, and as the D.C. Circuit held in Williams v. Liu in 2016, the history of Congress and the President working together to consistently raise or suspend the debt limit at relevant occasion is relevant to this analysis of whether these alleged harms are inherently speculative. Counsel, would you please respond to opposing Counsel's point that he kept saying that it will happen, it will happen, and I think he meant by that that your client will be put in the position, absent Congress acting before January 2nd, of taking some extraordinary measures to avoid a larger default. Those extraordinary measures would include deferring payments to the street fund and so forth. Is that what he's talking about, to your understanding, when he says it will happen, it will happen? Your Honor, maybe I can take a step back and explain both the role of the extraordinary measures and the allegations set forth in the complaint before the Court. So what will happen, or what may happen, I should say, because, again, we don't exactly know what will happen in January, under the Fiscal Responsibility Act, the debt limit is suspended until the first of the new year. At that point, the statutory debt limit, which is a number enacted into law, will be increased by the amount of debt that's been incurred since the enactment of the Fiscal Responsibility Act on June 5th of last year and January 1st of the coming year. At that point, the debt limit will be at the statutory debt limit, and the Secretary of the Treasury will be able to avail herself of the extraordinary measures that Congress has provided for in the statute, which Your Honor referred to. There are a number of levers that the Secretary of the Treasury Excuse me. One of those measures might impact opposing counsel's clients. Is that correct? No, Your Honor. One of those levers, which would be to suspend reinvestment in the G Fund, what that would entail is that, again, under the relevant statute, 5 U.S.C. 8438 G, subsection G, the Treasury Secretary can suspend reinvestment of funds that are invested in the G Fund, which is one of the funds in which thrift savings funds may be invested. Funds in that plan, sorry, funds in the G Fund, I apologize, are mature on a daily basis in the ordinary course, and then they're reinvested on a daily basis. Under this extraordinary measure provided for in the statute, they wouldn't be reinvested on a daily basis, but when that period of extraordinary measures elapses, what's called the debt issuance suspension period, if you'll forgive me for all the technical language, when that elapses, the fund is made whole, as both the plaintiff has acknowledged and described in the brief. So no one contests that that fund is at that point made whole. If at any time during that debt issuance suspension period, while the Secretary of the Treasury is engaged in that extraordinary measure, any individual with funds in the G Fund chooses to withdraw their funds, they're given their funds as if there had been no debt issuance suspension period declared. They're made whole. And so there is no harm even to an individual whose funds may be subject to that extraordinary measure, so to speak, whether during the debt issuance suspension period, if they choose to withdraw their funds, or afterward. And notably, plaintiff is not arguing and has no point alleged that any of their members did choose to withdraw funds from their investments in the G Fund to the extent they had any. They haven't identified any members who do, or identified any member who chose to withdraw their funds and did not receive their funds in whole as if a debt issuance suspension period had not been declared. And they acknowledge that they were made whole at the end of that debt issuance suspension period, and it ended on June 5th with the passage of the Fiscal Responsibility Act. And that's been the case in every instance in which the Treasury Secretary has exercised her discretion to declare a debt issuance suspension period. It's one of the levers that Congress has given the Secretary of the Treasury to allow for some maneuvering room, for some headroom during the period in which Congress and the President negotiate raising or suspending the debt limit. And that's exactly what would happen, or it would be one of the levers that would be available to the Secretary of the Treasury on January 2nd. There wouldn't, you know, the word default has lots of meanings in different contexts. It's not the case that on January 2nd the government would become immediately unable to meet its obligations and would fail to meet those obligations. At that point, Treasury Secretary, just as she did on January 19th, 2023, which is the date from the last debt limit impasse on which the Treasury Secretary declared that she would be engaging in extraordinary measures, that would be similarly what she could do on January 2nd. At some point, and I think she's had to do this in the past, she has to tell Congress, I'm at the limit of how these extraordinary measures will prevent a default. And if you don't act to increase the debt limit, then we will, then there will be an event of default. I mean, there are limits to how far she can, how long she can rely on these extraordinary measures. Is that not so? That's correct, Your Honor. We don't, we don't, the problem with plaintiff's allegations here is that we don't know if ever and when that limit will be reached in the future, when that point will be. And it's frankly quite difficult to predict. The reason these allegations are inherently speculative is that they depend not only on reaching that statutory debt limit, they depend also on the Secretary exercising her authority to engage in extraordinary measures, exhausting those extraordinary measures. They depend on what level of incoming tax receipts there are at any given point in any given year, what the outgoing expenditures of the government are. And all of that taken together determines when the government reaches a point where it's actually unable to meet its obligations, where there might actually be a point where the government can't make the payments it needs to make. The government's never reached that point. And that's precisely because Congress and the President have consistently worked together to raise or suspend the debt limit. And it's unprecedented, and that's exactly what the D.C. Circuit recognized. And Williams against Lewitt said, you know, the D.C. Circuit wrote that since 1962, Congress and the President have worked together over 70 times to raise or suspend the debt limit, and since 1982, more than 30 times, and so too in 2023. And all of that works together to make it so that plaintiff's allegations are inherently speculative in terms of any injury they allege. And plaintiff's allegations here, as I was saying earlier, I described them a little bit, are premised on the idea that at some point the government will become unable to meet its obligations, and then executive branch decision-makers will prioritize payments in a certain way that will lead to certain payments not being met. That's never happened in the context of the debt limit. It's never been the case that salaries have been deferred or delayed or that other sorts of spending obligations set forth by Congress have not been met. And because that point hasn't been reached, as the D.C. Circuit explained, it's inherently speculative to predict that it will be reached. To the extent plaintiff's claims are premised on any sort of hypothetical past harm, as Judge Stearns laid out in his opinion below, those claims would be moot because of the passage of the Fiscal Responsibility Act, and none of the exceptions to mootness apply here. Again, for the same reasons we've talked about, all these claims of any sort of future harm are unprecedented, and we don't expect them to occur, let alone recur. For these reasons, we think dismissal is proper, and we'd urge this Court to affirm. And this Court has no further questions. Any further questions? Okay, thank you very much. Thank you. Counselor, excuse me, thank you very much. Let's call the next case. Thank you.